1

2

3

4

5

6

7

8                     IN THE UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10   STEVIN NOEL FAITH,

11              Petitioner,              CIV S-00-0493 DFL GGH P

12       vs.

13   JIM HAMLET, Warden,

14              Respondent.             FINDINGS & RECOMMENDATIONS

15   _____/

16   *Introduction and Summary*

17              On April 30, 1981, petitioner was convicted for the first degree murder of

18   Deborah Cox (hereinafter "Cox" or "the victim"), for which he was sentenced to a term of 25

19   years to life.  Before the court is petitioner's second habeas petition, which alleges ineffective

20   assistance of counsel for failure to adequately investigate forensic evidence indicating Cox died

21   from aspirating and suffocating on her own stomach contents rather than being strangled by

22   petitioner.  The petition has been narrowed to the issue of ineffective assistance of counsel after

23   extensive briefing, discovery and hearings concerning some of the most complex habeas corpus

24   procedural situations ever faced by the undersigned.

25              By way of background, petitioner was convicted of murdering Cox, who

26   depending on which version one now accepts, either: 1) had rough sex with petitioner which led

                                        1

to her strangulation; or, 2) being very inebriated, suffocated on her own stomach contents after petitioner left her.  The murder trial was marked by alarming behavior on the part of the trial court judge and poor preparation by petitioner's counsel.  Petitioner's trial counsel, Gordon Wilson ("Wilson"), an attorney just two years out of law school, had information supportive of a non-strangulation cause of death, but did not seek expert opinion on the matter until nine days before trial was set to begin.  In particular, as early as February, Wilson had information that the victim had been hospitalized in the past for choking on her own mucus after drinking to excess.  At trial, Wilson offered no forensic evidence of the non-strangulation theory.  This delay and failure to present such evidence lies at the heart of petitioner's present habeas petition.

Another set of issues raised in petitioner's present habeas case have been deemed barred on procedural grounds, but are discussed here for background.  These issues involve a claim of jury coercion by the trial judge, who pressed the jury to conclude the trial in three days, ostensibly because he had a vacation planned for the Friday of the week trial began.  When jury selection began on Monday April 27, 1981, the judge told the prospective jury: "[W]e've got a four day case that we're going to try in three days."  RT (state) 193.  The judge made clear to the jury that they were to return a verdict no later than Thursday of that week, remarking on Thursday afternoon when the case was going to the jury that they would return the verdict that evening/night, even if it took until midnight.  RT (state) 439-40.  The jury returned a verdict that evening.

Plaintiff directly appealed the conviction, but did not raise any of the issues raised in the present habeas motion.  That is, he did not argue ineffective assistance of counsel in getting the present medical evidence before the jury.[1]  The appellate review resulted in affirmance of the conviction, and petitioner's later petition for review with the California Supreme Court was denied on February 10, 1983.  Even before direct review was over, petitioner

---

[1] Rather, he argued <u>Doyle</u> error and ineffective assistance regarding that error and other errors unrelated to the present issues (CIV-S-84-699 EJG).

2

had filed state habeas corpus petitions asserting ineffective assistance of counsel for essentially the same issues as were raised on direct review.  All of the initial round of state habeas petitions, again raising issues not raised herein, were completed by November 9, 1983.

On June 19, 1998, petitioner began a new round of state habeas filings raising the juror coercion issue asserted herein as well as associated ineffective assistance of counsel claims. These claims were finally denied on June 30, 1999, with the decision of the state supreme court citing cases indicative of a procedural bar – failure to timely raise issues in habeas and failure to raise issues which should have been raised on direct review.  Petitioner then filed his first federal habeas petition, which was denied in 1986, and from which no appeal was taken.

Because of the successive nature of the present petition, as amended, the court ordered the petition transferred to the Ninth Circuit for purposes of the "gatekeeper" function prescribed by 28 U.S.C. § 2244(b)(3).  On July 13, 2001, the Ninth Circuit permitted the petition to proceed in the district court.  Petitioner then requested that his returned habeas petition, then fully exhausted, be held in abeyance while new claims were exhausted.  This request was granted, and exhaustion was completed on March 6, 2003, with the state supreme court again denying the newly exhausted claims on grounds of untimeliness.

By April 28, 2003, the federal petition was amended to include the claim that trial counsel was ineffective because he had not presented pathology evidence indicating that petitioner had not been involved whatsoever in causing Cox's death.  After review of the motion to dismiss filed by respondent (July 18, 2003), made on grounds of successive petition and statute of limitations, the undersigned ordered an evidentiary hearing in order to resolve the factual issues associated with the motion.  The evidentiary hearing was held on May 25 and 26, 2004, with a final hearing on June 1, 2005, at which respondent presented rebuttal expert testimony regarding the victim's cause of death.

At the first hearing, petitioner presented expert forensic pathologist, Dr. John T. Cooper, who testified that based on his review of microscopic slides from the autopsy, he

believed Cox died from aspirating and suffocating on her stomach contents and not by
strangulation.[2]  At this hearing, Dr. Joseph H. Masters, the forensic pathologist who performed
the autopsy on Cox, also appeared but did decline to testify as an expert since he had retired from
the field in 1995.  At the second evidentiary hearing in June 2005, respondent presented expert
forensic pathologist Dr. Sharon H. Van Meter, who agreed with Dr. Master's original
conclusions from 1980, and opined from a review of the evidence that Cox's death was caused
by manual strangulation.

As set forth in the findings and recommendations of August 30, 2004, issued after
the first evidentiary hearing in May 2004, the undersigned found petitioner had diligently pursued
his jury coercion claim, but that it did not meet the prejudice (actual innocence) standard for
successive petition.  The district court adopted this finding, but also held that the claim was not
timely brought under 28 U.S.C. 2244(b)(2)(B)(I).  The undersigned also found that petitioner had
demonstrated due diligence in pursuing his non-strangulation (actual innocence) claim, and that it
was not barred by the statute of limitations.  Specifically, the undersigned found that petitioner's
incomplete evidence regarding the complex scientific theory of aspiration versus strangulation
did not constitute lack of diligence.  Once the scientific facts underlying the aspiration theory
were acquired through petitioner's present counsel and testifying expert, Dr. Cooper, petitioner
diligently pursued his claim of actual innocence.  The district court adopted these findings.

Accordingly, the only issue now before the court is petitioner's claim for
ineffective assistance of counsel for failure to timely obtain expert medical opinion on the cause
of Cox's death.  Petitioner's claim is that his trial counsel was ineffective, or that he was actually
innocent, because counsel ignored a predisposition on the part of the victim to choke when she
had too much to drink, and that, if properly investigated, an expert would have determined that

---

[2]  "Aspiration" is the act of inhaling.  <u>Dorland's</u> Illustrated Medical Dictionary (27th ed.)
(1988), at p. 156.  The term, as discussed herein, refers to the act of inhaling, and ultimately
suffocating on, stomach contents.

1   the victim aspirated on her stomach contents as opposed to being strangled to death.

2         To succeed on his claim of ineffective assistance of counsel, petitioner must show

3   (1) that trial counsel's representation fell below an objective standard of reasonableness; and (2)

4   that there is a reasonable probability that, but for trial counsel's unprofessional errors, the result

5   of the proceeding would have been different.  Strickland v. Washington, 466 U.S. 668, 688, 694,

6   104 S. Ct. 2052 (1984).  The undersigned addresses these issues in light of all the evidence,

7   including that presented at both evidentiary hearings.

8   *Summary of Evidence*

9         Before the court is petitioner's testimony concerning the events of the fatal night

10  in December 1980, which has varied greatly from the initial investigation to his most recent

11  testimony at the evidentiary hearing.  Also before the court is evidence from the 1981 trial, as

12  well as that presented at the evidentiary hearings in 2004 and 2005.[3]

13        At this point, petitioner no longer disputes that he encountered Cox at the Buttes,

14  a local bar, on December 12, 1980.  Both had been drinking heavily, when petitioner and Cox

15  agreed to leave the bar and went to petitioner's friend's vacant residence.  There, they engaged in

16  rough anal intercourse.  On December 13, 1980, police discovered Cox's dead body at the house.

17  Beyond this, we have only petitioner's account of what transpired there, and differing expert

18  opinion as to the cause of Cox's death.[4]

19  \\\\\

20  \\\\\

21

22   [3] Citations to the transcript of the first evidentiary hearing are referred to as either "RT Vol. I" or "RT Vol. II."  Citations to the second evidentiary hearing are referred to as "RT Vol.

23   III."  Citations to the trial transcript are referred to as "RT (state)."

24   [4] These physicians offered testimony concerning the following material issues: bruising and petechiae on the victim's neck; the lack of classic signs of manual strangulation; the victim's

25   pulmonary edema; the presence and significance of fluids in the victim's lung tissue; the presence or absence of signs of inflammation in the victim's lung; and, the presence of mucoid

26   material in the victim's nose and mouth at the crime scene and autopsy.

*Petitioner's Testimony*

With regard to petitioner's account of his interaction with Cox, the versions are many.  During the police investigation of Cox's death, petitioner initially claimed that he had gone to his friend's vacant residence to sleep when he discovered Cox's dead body there.  Petitioner notified the police, and told them he had touched various parts of the body to determine if she was dead.  Court of Appeal Opinion at 3.  Petitioner later asked a friend to inform the police that he had been at the friend's house on the night of the murder and not at the Buttes.  RT (state) 204.  Petitioner then conceded to the Chief of Police that he had been at the Buttes, but initially denied any contact with Cox.  He told them when he discovered her body in the residence he checked for her pulse by putting his hands in a choking position around her neck.  RT (state) 336-37.   Then, at Wilson's behest, petitioner submitted to a polygraph test, at which he told the interviewer that he had sex with Cox in the back seat of his car.  RT Vol. II, 12-13.  He said they then went to his friend's vacant house, laid in the bed for awhile, with petitioner leaving at 12:30 a.m., telling Cox he would come back for her in the morning.  See Pet. Exh. I.

At trial, petitioner admitted having contact with Cox at the Buttes, and testified that they had agreed to spend the night together.  RT (state) 379.  He stated that they agreed to have anal sex and petitioner left immediately afterwards to go home with the promise that he would be back to take her home in the morning.  He also indicated that nothing unpleasant had transpired between them and that Cox was alive and moving when he left.  RT (state) 385-88.

By contrast, petitioner testified at this evidentiary hearing that during sex, the victim goaded him to be rougher and chided him for not knowing what he was doing.  RT Vol. I, 94.  Petitioner claimed to be taken aback by this commentary, but also testified that he obliged, saying, "I'm going to you know, ride you like a stallion . . ." and then grabbed his buck knife from his pants and sliced the top of her shirt, using the shirt ends like "reigns on a horse."  RT Vol. I, 94-95.  Petitioner testified that after sex, Cox noticed her shirt was destroyed and became angry.  RT Vol. I, 95.  He said Cox demanded payment for the shirt and when petitioner said he

had no money, Cox grabbed his hair and threatened to tell petitioner's wife (common law) about what had just transpired.  RT Vol. I, 97.  When Cox would not let go of his hair, petitioner testified that he "started to choke her" but released his grip deciding "that's not a good idea."  RT Vol. I, 97.  He then hit her, testifying that he intended to hit her in the mouth, but found out later from Dr. Master's testimony that he had in fact struck her in the throat.  RT Vol. I, 181.  He commented "and that's what I think led to her demise."  RT Vol. I, 181.  Finally, he told Cox she could walk home, to which she did not reply.  When he left the house, the lights were out and Cox was alive, in bed and moving.  RT Vol. I, 182.

It is undisputed that petitioner returned to the vacant house early the next morning.  Once inside the house, he testified that he jostled the victim's body, trying to "wake her up."  RT Vol. II, 19.  He stated "she was lying on her stomach, it appeared to me, and when I tried to turn her over . . . she wouldn't wake up."  RT Vol. II, 18-19.  He said he "pulled on her to roll her over and you know, wake her up, she started to come off the bed, and I let go of her, and she rolled back onto the bed, and into the pillows, the one pillow fell over her face, and I looked, I looked over, and that's when I seen her face, and the brown substance. . . ."  RT Vol. II,  18-19.  Petitioner's trial testimony was similar in that he testified the victim was face down when he tried to turn her over.  RT (state) 392.

### *Dr. Cooper's Testimony*

At the hearing on May 25, 2004, Dr. John T. Cooper, a forensic pathologist, testified that in his expert opinion, Cox's death was accidental and was caused by the aspiration of her stomach contents resulting in asphyxia.[5]  (RT Vol. I, 18).  His opinion hinged primarily on

\\\\\

\\\\\

---

[5] Dr. Cooper testified that he reviewed the police report that the victim had been hospitalized in the past for choking on her mucus when she drank to excess, but said it was just interesting background material and had no significance for analyzing how she died.  RT Vol. I, 66.

1   analysis of microscopic slides of tissue specimens taken from the victim's lungs at the autopsy.[6]

2   RT Vol. I, 13, 23-24.  He also based his opinion as to the cause of death on the absence of classic

3   signs of manual strangulation, which he said include extensive and multiple bruising of the neck,

4   a fractured hyoid bone (a "U-shaped bone above the larynx"), fractures of the cartilages of the

5   larynx or trachea, and laryngeal cartilages fractured at least in one place.  RT Vol. I,  32.

6   However, Dr. Cooper admitted on cross-examination that it is possible to have strangulation

7   without all the classic findings, and that the bruise on the victim's neck could be consistent with

8   putting pressure on the neck.  RT Vol. I, 45.

9          At the hearing, he explained his analysis using photographs of the autopsy slides,

10  which included images from small and medium-sized airways.  In particular, Dr. Cooper

11  discussed a slide of the victim's medium-sized airway that showed a cluster of squamous

12  epithelium lining cells.  RT Vol. I, 37.  He explained that this kind of epithelium lines the mouth,

13  the back of the throat and the esophagus, but is not found in the airways.  He therefore concluded

14  that for it to get into the airways, Cox must have aspirated it.  RT Vol. I, 37.  Further, he

15  discussed a picture of the small airways that showed a cluster of sloughed off bronchial-type

16  epithelial cells along with acute inflammatory cells.  He stated this was not a normal autopsy

17  feature of small airways of the lungs.  RT Vol. I, 37-38.  He compared this to a photograph of a

18  "control" airway from someone who had died of natural causes that showed a thick layer of

19  bronchial epithelium still adhered to the wall and not sloughed off, with a minimal amount of

20  material in the airway and no substantial inflammation.  RT, Vol. I, 38.

21         On cross-examination, respondent questioned Dr. Cooper as to whether the

22  contents found in Cox's airways could have resulted from terminal/agonal aspiration, that is,

23  inhalation of regurgitated materials during the dying process, which is not the actual cause of

24

25          [6] Dr. Cooper explained that the slides he reviewed were made from paraffin blocks, which were used to store tissue taken from the autopsy.  A lab in Sacramento prepared the slides from the paraffin blocks.  He explained that when tissue is stored in paraffin, it does not change

26  at all over time.  RT Vol. I, 43.

8

death.  RT Vol. I, 61-62.  Dr. Cooper conceded that vomiting could occur as part of the dying

process, and that pathologists are cautioned not to jump to the conclusion that aspiration is the

cause of death without evidence of material in the lower airways, which he thought existed in this

case.  RT Vol. I, 61.

With regard to Dr. Master's autopsy finding of pulmonary edema (a large amount

of fluid in the lungs), Dr. Cooper commented that this is not something generally associated with

strangulation or other types of traumatic deaths.  RT Vol. I, 38.  Dr. Cooper noted that a

photograph of a medium power view of the air spaces in Cox's lungs showed "an abundance of

frothy material that stains pink because it's got a lot of protein in it."  RT Vol. I, 39.  He opined

that this debris was consistent with stomach fluid contents, and explained that no meat or

vegetable fibers were present because the victim had no actual food in her stomach.  See

Petitioner's Exh. 67 (Consultation Report Addendum).  He concluded that slides showed a "very

substantial example of pulmonary edema," and that in this case, Cox's lungs were beginning to

react to irritative stomach acids drawn into the lungs.  RT Vol. I, 39-40.

Dr. Cooper also offered his opinion concerning the bruising on Cox's neck and

the petechiae[7] on her face and neck area and in the conjunctiva of her eyes.  RT Vol. I, 19-20.

With regard to the petechiae, Dr. Cooper opined that they were caused by Cox being in a face

down position after she died.  He explained that this interpretation was consistent with a theory

of non-strangulation based on the bruise found on Cox's neck.  RT Vol. I, 21.  Specifically, he

stated that the petechiae near the bruise that Master's characterized as consistent with manual

strangulation were too far below the bruise to indicate strangulation energy.  Dr. Cooper

explained that petechiae should be upstream of the supposed strangulation site because the force

used to strangle a person blocks blood flow from the head, while the arterial supply going up the

_____

[7]  Dr. Cooper explained that "petechiae" are "small, pinpoint hemorrhages that show up
as little red dots" and are associated with "asphyxia due to strangulation" or from "being in a face
down position post-mortem."  RT Vol. I, 19, 20-21.

neck and into the head continues.  The blocked flow of blood back down causes the pressure in

the capillaries to burst, resulting in the petechiae above the strangulation site.  RT Vol. I, 19-21.

Dr. Cooper explained that the appearance of petechiae below the supposed strangulation site, i.e.,

the bruise on Cox's neck, bolstered his conclusion that strangulation was not the cause of death.

RT Vol. I, 21.

Dr. Cooper described the bruise on Cox's neck as "essentially one solitary bruise"

(RT Vol. I, 22) that was more suggestive of a blow to the neck than strangulation, given the

absence of the classic signs of manual strangulation.  RT Vol. I, 23, 32.  Further, Dr. Cooper

opined that the bruise was inflicted "some two to four hours before she died."  RT Vol. I, 41.  He

explained that the photographs of tissue from the bruised area showed little round dots, which are

inflammatory cells, which he interpreted to mean the body was mounting a reaction to the

contusion.  RT Vol. I, 41.  He explained that one does not typically see microscopic evidence of

an inflammatory response until at least two to four hours after the bruise has been inflicted,

which explains his opinion that the bruise was inflicted between two to four hours before Cox's

death.  RT Vol. I, 41.  In his opinion, this meant that the bruise was consistent with an altercation

followed by a space of two to four hours followed by accidental asphyxia due to aspiration.  See

Petitioner's Exh. 67 (Consultation Report Addendum).

Upon questioning by respondent, Dr. Cooper discussed photographs of the victim

that showed a brownish-red fluid coming from her nose and mouth in addition to testimony by

Sergeant Kenn Owen concerning his observations of the body at the house where Cox died.  RT

Vol. I,  48-50.  Dr. Cooper surmised that the reddish-brown fluid on Cox's face matched the

description of the fluid found in her stomach, and likely also contained blood from irritation of

the airway as well as sloughed off lining cells from the airway.  RT Vol. I, 50, 55.  With regard to

Owen's testimony about the fluid, Dr. Cooper stated, "the fact that there's enough to elicit this

kind of detail in the recollective description of it by the individual who first moved the body, it's

– it definitely sounds substantial to me, that she's got a substantial amount of fluid which in

10

description matches the fluid – the brownish mucus-like fluid that was found in her stomach."
RT Vol. I, 50.  Dr. Cooper also discussed photographs taken at the medical examiners that show
more fluid coming from the victim's nose and mouth.  Dr. Cooper explained that when a dead
body is moved, turned or transported, stomach contents can come out of the mouth because the
esophageal sphincter that keeps things in the stomach is no longer functional.  RT Vol. I, 57.

### Dr. Masters' Testimony

On May 26, 2004, Dr. Masters appeared at the evidentiary hearing, but declined to
testify as an expert due to his retirement from the field in 1995.  RT Vol. II, 35.  Specifically, he
stated that he considered himself an expert forensic pathologist when he was in active practice,
but that he no longer presents himself as such.  RT Vol. II, 36.  He did, however, testify about the
autopsy report and the conclusions and terminology contained therein.

In particular, he discussed his finding that this was an asphyxial death with
associated manual strangulation.  RT Vol. II, 38.  He stated that the bruises in the neck region
indicate a blunt force injury to the deeper tissues of the neck, and that the bruising is not
consistent with one single blow to the neck.  RT Vol. II, 40.  He explained that these are deep
bruises which appear in different parts of the neck – some anterior to the larynx, some deeper in
the region of the trachea (air passage going to the lungs) and some are behind the trachea in front
of the vertebral column.  RT Vol. II, 38.  He also described his findings with regard to the lungs,
which indicate the presence of pulmonary edema.  Speaking in generalities, Dr. Masters stated
that pulmonary edema is common in "many, many deaths," and is not uncommon in someone
who's had trauma to their neck.  RT Vol. II, 41.  Dr. Masters discussed his microscopic
examination of the victim, stating that nothing in his findings was significant or suggestive of
stomach contents in the lungs.  RT Vol. II, 42.

Dr. Masters went on to define and explain some of the terminology related to the
microscopic findings.  He explained that the mucoprotein material found in the lungs was not
unusual, as the lining of the lungs make the mucus, and the protein is something that's present in

11

most fluids of the body.  RT Vol. II, 44.  He also noted the presence of bacteria in the lungs,
commenting that it could have been the postmortem growth of bacteria or bacteria related to
something wrong with Cox's respiratory passages or mouth.  RT Vol. II, 45.  In response to the
court's question as to the possibility that the bacteria in the lungs was stomach bacteria, Dr.
Masters answered it was unlikely because gastric acidity ordinarily does not allow the growth of
bacteria.  RT Vol. II, 45-46.

Dr. Masters also noted that the fibromuscular substance of the lung walls showed
infiltrative leukocytes, plasma cells, and eosinophils, which suggests that Cox at some time in the
past had some kind of inflammatory disease in her lungs.  RT Vol. II, 45.  He also noted the
presence of pigmented microphages, which indicate that Cox probably at some time in the past
had some kind of bleeding into the lung.  RT Vol. II, 46.  With regard to his finding that there
was "no intraalveolar inflammatory exudate" found in the lungs, Dr. Masters explained that the
alveolar spaces are small air sacks in the most distal part of the respiratory tract, and that this
finding shows there is no acute infection or pneumonia in the lung.  RT Vol. II, 47.  He also
discussed his finding that the alveoli contain "intraluminal eosinophilic material."  He explained
that this means there was fluid containing protein in the lungs (and that most body fluids contain
protein), which suggested pulmonary edema.  RT Vol. II, 47.

### Dr. Van Meter's Testimony

Dr. Van Meter appeared at the second evidentiary hearing on June 1, 2005, and
offered expert testimony concerning the autopsy findings and cause of Cox's death.[8]  Many of the

---

[8]  Initially, petitioner's counsel expressed concern that a potential conflict of interest existed as Dr. Van Meter is a partner at Western Laboratories Medical Group, and worked there in 1981 at the same time as Dr. Paul Herrmann, the pathologist contacted by petitioner's trial attorney.  RT Vol. III, 9.  Petitioner's counsel conducted voir dire on Dr. Van Meter as to the potential conflict, and was satisfied that none existed after Dr. Van Meter testified that she was not aware of any contact between petitioner's trial attorney and Dr. Herrmann, either in 1981 or up to the present.  RT Vol. III, 10-11, 13.  She also stated that nothing came up when the present case was entered as her case, and that she was unaware of any ethical rules that would prohibit medical partners from taking payment from two sides in the same case.  RT Vol. III, 10.

1    questions related to a report she prepared for the state after examining the autopsy findings, the

2    crime scene and autopsy photographs, the testimony of Kenn Owen, Dr. Masters, the declarations

3    and testimony of Dr. Cooper, and a CD-ROM containing photographs of the microscopic slides.

4            With regard to the petechiae found on the area around Cox's neck, Dr. Van Meter

5    offered the same general explanation of how petechiae occur as offered by Dr. Cooper, although

6    she opined that the petechiae that appear below the alleged strangulation site are consistent with a

7    finding of manual strangulation.  RT Vol. III, 23.  She explained that these petechiae could be

8    caused by a person repeatedly placing his hands on the neck.  RT Vol. III, 22-23, 79.

9            As to injuries around Cox's neck, Dr. Van Meter noted Dr. Masters found

10    hemorrhages in the peritracheal tissues, and commented that these could indicate pressure on the

11    soft tissues of the neck sufficient to cause bleeding into these tissues, which is consistent with

12    manual strangulation.  RT  Vol. III,  35-36.  As to the absence of classic signs of manual

13    strangulation such as a fractured larynx, Dr. Van Meter cited Dr. Masters' finding that the

14    victim's larynx structures were quite pliable.  See Resp. Exh. K.  Further, Dr. Van Meter

15    commented that the injuries noted in the autopsy report – a bruise in the left lateral neck,

16    scattered skin, petechiae near the midline of the neck, and more in the anterior right lateral neck,

17    as well as zones of bruising in the left anterior larynx, posterior to the upper trachea, and on the

18    posterior esophagus – are all consistent with strangulation.  RT Vol. III,  37.  In sum, these

19    injuries and the petechiae on the neck area and in the victim's eyes were the main reasons Dr.

20    Van Meter concluded the cause of death was manual strangulation.

21            She commented that if Cox had died of aspiration, it would be much less likely

22    that petechiae would appear.  RT Vol. III, 40-41.  Furthermore, she stated that she would not

23    expect someone to die if a small amount of liquid were aspirated into the lungs.  RT Vol. III, 83.

24    She testified that the lungs of a person who dies of aspiration typically will contain a

25    "tremendous amount of material that doesn't look quite like . . . edema" and will sometimes have

26    particulate matter in it, collagen, or vegetable matter, or a frothy, different appearance than the

edema fluid.   RT Vol. III, 30.  Dr. Van Meter testified that Dr. Masters' autopsy report regarding

Cox's lungs sounded average.  RT Vol. III, 30.  She indicated that had the victim died of

aspiration, she would expect to see a "massive amount" of gastric contents in the lungs or gastric

contents containing food chunks, which could cause asphyxia.  RT Vol. III, 39-40.  She testified

that it is a "very unusual circumstance, even when someone is very intoxicated, that they actually

aspirate sufficiently to cause them to die, unless it's large food particles."  RT Vol. III, 85.

Further, Dr. Van Meter testified that many people, in the final moments of dying, will regurgitate

some stomach contents, which they may aspirate, but which is unrelated their death.  RT Vol. III,

31.

    With regard to the lung tissue slides, Dr. Van Meter noted the presence of slough

surface mucosa and protein material in the bronchi, opining that this was pulmonary edema,

which she stated is a very common finding for anyone who has died, for whatever reason.  RT

Vol. III, 26-27.  She explained that pulmonary edema is simply fluid that has seeped from the

cells lining the lung air spaces in to the actual spaces.  During the process of dying, and after

death, the very delicate lining cells slough off.  The blood flow back to the heart slows down, and

much of this back up into the lungs.  The fluid appears in the lungs from pulmonary edema as a

sort of reaction to whatever stress is causing irregularities in breathing and heart function.  RT

Vol. III, 28.  As to the findings in Dr. Masters' autopsy report regarding Cox's lungs, Dr. Van

Meter testified that what was described sounded average.  RT Vol. III, 30.

    Dr. Van Meter testified that no inflammatory response in the lungs was visible.

She discredited Dr. Cooper's finding of an inflammatory response, explaining that if a person

aspirates foreign material into the lungs, the body mounts an inflammatory response, but it takes

several hours, or even days, for signs of the response to appear.  Therefore, if something occurred

shortly before death to cause such a reaction, no inflammatory response would be visible.  RT

Vol. III, 34-35.

\\\\\

As to the slides discussed by Dr. Cooper at the first evidentiary hearing, Dr. Van Meter described the process of how slides are made and how greatly the slides discussed by Dr. Cooper were magnified.  She seemed unimpressed with their ability to give a definitive conclusion as to the cause of death.  With regard to the slide of a small bronchus (Exh. 72), Dr. Van Meter noted that the lining cells had sloughed off, and that there were only a few inflammatory cells, but "nothing to suggest even a very, very early pneumonia type reaction or inflammatory reaction."  RT  Vol. III, 44-45.  She further stated that after looking at this slide, she did not think it really "had much of anything to do with the cause of death." RT Vol. III, 49.  As to the picture described as "medium sized bronchus with squamous epithelium debris and inflammation" (second picture, Pet. Exh. 72), Dr. Van Meter commented that the appearance of epithelium did not necessitate a finding of aspiration, nor was there an unusual amount of sloughing present.  RT Vol. III, 50.  The next slide, "close up of medium-sized bronchus with squamous epithelium," a close-up of the previous picture, Dr. Van Meter noted the presence of both squamous cells and columnar cells.  She explained that frequently along the upper bronchi there will be epithelium that "goes a little sideways" and gets characteristics of both squamous and columnar cells, as a result of smoking or breathing in other pollutants.  RT Vol. III, 50-51.  She stated that the sloughing part is just a result of dying and that during the dying process, the most vulnerable cells slough off.

The slide entitled "pulmonary edema, early chemical pneumonitis due to aspiration" was presented to Dr. Van Meter, who disagreed with the description as being early chemical pneumonitis due to aspiration, and stated that nothing in the slide would suggest that Cox aspirated.  RT Vol. III, 52.  She defined pneumonitis as "pneumonia, inflammation."  RT Vol. III,   53.  She opined that the "pink stuff" was edema fluid, and that she did not see any significant inflammation.  RT Vol. III, 52.  As to a further enlargement of that slide, with the same title, Dr. Van Meter stated she saw no evidence of aspiration and indicated that the slide did not provide any meaningful guidance regarding the cause of Ms. Cox's death.  Further, Dr. Van

1    Meter stated that seeing the slides allowed her to frame her analysis in a large context, and that

2    they only reinforced her opinion that the lungs showed edema and that there was no real evidence

3    of inflammation.  RT Vol. III, 69.

4         With regard to Cox's blood alcohol level, reported to be .23, Dr. Van Meter

5    admitted that this level could have had a sedative effect on her responses and coordination, but

6    that she did not think that it necessarily indicated she had significant aspiration.  RT Vol. III, 67.

7    *Ineffective Assistance of Counsel*

8         The United States Supreme Court has described the standards this court must

9    apply to an ineffective assistance of counsel claim.  The test for demonstrating ineffective

10   assistance of counsel was set forth in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052

11   (1984), and this test survives.  First, a petitioner must show that, considering all the

12   circumstances, counsel's performance fell below an objective standard of reasonableness.

13   Strickland, 466 U.S. at 688.  To this end, the petitioner must identify the acts or omissions that

14   are alleged not to have been the result of reasonable professional judgment.  Strickland, 466 at

15   690.  The federal court must then determine whether in light of all the circumstances, the

16   identified acts or omissions were outside the wide range of professional incompetence.  Id.

17   Second, a petitioner must affirmatively prove prejudice.  Strickland, 466 U.S. at 693.  Prejudice

18   is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the

19   result of the proceeding would have been different.  Id. at 694, 104 S. Ct. at 2067.  A reasonable

20   probability is a "probability sufficient to undermine confidence in the outcome."  Id.

21        Here, petitioner alleges ineffective assistance of counsel with regard to Wilson's

22   failure to conduct an adequate investigation into the state's pathology evidence and call an expert

23   such as Dr. Cooper.  Thus, the issue is whether trial counsel's failure to get the "correct" medical

24   evidence before the jury constituted ineffective assistance of counsel.  Petitioner claims that his

25   counsel was ineffective because he ignored a predisposition on the part of the victim to choke

26   when she had too much to drink, and that if properly investigated, an expert would have

16

determined that the victim did indeed aspirate on her stomach contents rather than being strangled to death.

The facts show that counsel was aware of a police report indicating that in the past, the victim was hospitalized after choking on her own mucus while intoxicated. That report, dated December 16, 1980, noted a phone call to police from the victim's stepmother, wherein she stated that the victim had breathing problems "when she got drunk" and recalled the incident leading to the victim's hospitalization two years prior. See Pet. Exh. C. It is not clear precisely when defense counsel became aware of this report, but the evidence shows he knew at least by the date of the preliminary hearing (February 5, 1981), where he alluded to the previous incident of Cox choking on her own mucus.[9]

However, it was not until March 26, 1981, that defense counsel petitioned the court for the appointment of a forensic expert. See Pet. Exh. C. On April 15, 1981, the court issued an order appointing Paul Herrmann, M.D., to conduct a forensic examination and to make a confidential report on the results to Wilson. Pet. Exh. D. On April 13, 1981, defense counsel wrote a letter to Dr. Herrmann, requesting "any suggestions for cross-examining the prosecution's pathologist, Dr. Masters. Of special concern is the cause of death. Information from my client indicates the possibility that Ms. Cox did not die of manual strangulation. We know, too, that on at least two occasions, she strangled on her own while drunk, and had to receive emergency treatment. . . . Since the time is so short, trial scheduled begin April 22th, perhaps you could telephone a report as soon as you have any suggestions." Pet. Exh. E. Jury selection began on April 27, 1981, and a verdict was reached on April 30, 1981. Nothing in the

---

[9]     By defense counsel: Q.... Would your opinion as to your provisional diagnosis or any of your opinions to which you testified be altered in any way if you had information or knew that Deborah Cox did have a condition in which she had been more than once admitted to the hospital for choking on her own mucus?

CT (state) (Augmented) 111-14.

1   record shows that trial counsel received a response from Dr. Herrmann, or if he did, what that

2   response was.[10]  The record does show, however, that Wilson had notice at least by early

3   February 1981 of medical evidence indicating an alternative theory of victim's death, i.e.,

4   aspiration, but he did not seek expert opinion on that theory until April 13, 1981, nine days

5   before his client was set to be tried for first-degree murder.

6           Whether counsel's performance is deficient is measured against an "objective

7   standard of reasonableness" under "prevailing professional norms."  Rompilla v. Beard, 125 S.

8   Ct. 2456, 2462 (June 20, 2005) (citing Strickland, 466 U.S. at 687).  Hindsight is discounted by

9   pegging adequacy to 'counsel's perspective at the time' investigative decisions are made."  Id.

10  (citing Strickland, 466 U.S. at 689).

11          At the time petitioner's counsel decided to investigate the scientific aspect of

12  whether the victim asphyxiated on her own mucus, trial was less than a month away.  Even if one

13  marks March 26, 1981 (request for appointment of expert), as the date Wilson decided to

14  investigate this aspect of the evidence, his delay is unreasonable.  As noted above, he had notice

15  of aspiration as a possible cause of death at least by February 5, 1981, the date of the preliminary

16  hearing.  This alternating theory as to the victim's cause of death, if true, was not just mitigating

17  evidence, it was dispositive as to guilt and could have exonerated his client of the murder charge.

18  It certainly could have worked to create reasonable doubt in the minds of the jurors as to whether

19  petitioner's interaction with Cox actually caused her death.  Despite the potential of this

20  evidence, Wilson did not follow up on it until April 13, 1981.  His letter to Dr. Herrmann

21  acknowledges the little time remaining before trial, which he states was scheduled to begin on

22  April 22.

23  \\\\\

24

_____

25      [10]  Petitioner's current counsel indicated at the hearing that he contacted Dr. Paul
    Herrmann, the pathologist Wilson contacted on April 13, 1981, and that Herrmann said there was
26  no indication in his file that he had ever offered the opinion to defense counsel.  RT Vol. II, 92.

1    Wilson was aware of Cox's prior hospitalization for aspirating her mucus when

2  she drank to excess.  He also knew that the state would present expert testimony that the cause of

3  death was strangulation.  He knew he needed to have an expert analyze the autopsy results with

4  an eye to whether aspiration could have been the cause of death.  He undoubtedly knew that this

5  alternative theory of death could possibly exonerate his client, or that it might create reasonable

6  doubt in the jurors' minds as to the actual cause of death.  Given counsel's awareness of the need

7  for this evidence and of its tremendous value, the court finds his delay unreasonable.

8    Because defense counsel's failure to timely conduct an investigation into the

9  state's pathology evidence was unreasonable, the undersigned must address the issue of

10  prejudice, i.e.,  whether "there is a reasonable probability that, but for counsel's unprofessional

11  errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

12  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."

13  Id. at 694, 104 S. Ct. at 2068.  In making this determination, a court must consider the totality of

14  evidence before the factfinder:

15    Some of the factual findings will have been unaffected by the errors, and
      factual findings that were affected will have been affected in different
16    ways.  Some errors will have had a pervasive effect on the inferences to be
      drawn from the evidence, altering the entire evidentiary picture, and some
17    will have had an isolated, trivial effect.  Moreover, a verdict or conclusion
      only weakly supported by the record is more likely to have been affected
18    by errors than one with overwhelming record support.  Taking the
      unaffected findings as a given, and taking due account of the effect of the
19    errors on the remaining findings, a court making the prejudice inquiry
      must ask if the defendant has met the burden of showing that the decision
20    reached would reasonably likely have been different absent the errors.

21  Id. at 696.

22  In this case, the prejudice analysis asks whether there is a reasonable probability that, absent

23  Wilson's failure to earlier seek expert forensic evidence as to the possibility of death by

24  aspiration, the jurors' decision would have been different in light of all the evidence before it.

25    With all the evidence now before it, the court considers that very question.  That

26  evidence includes petitioner's account of the fatal night, which has varied considerably over the

19

years.  It also includes differing expert opinions as to the significance of deep bruising and petechiae around Cox's neck and whether the fluid found in her lungs was merely a result of her death or the cause of it.

First, petitioner's testimony and various accounts of what happened on December 12, 1980, are markedly inconsistent.  He has changed his story numerous times over the past twenty-five years – from denying any contact with Cox whatsoever, to saying they had sex in his car, to saying they had sex in the house, to denying any unpleasantness between them, to admitting he cut her clothes off with a buck knife and later started to choke her – and therefore is a less than credible witness.

Next, we have the undisputed evidence that the victim's body shows deep bruising on the neck and petechiae in the neck region and in her eyes. The experts disagree as to whether the bruise was caused by a blow to the neck or rather by petitioner strangling the victim. They also disagree as to the significance of the petechiae.  Dr. Cooper opined that these pinpoint hemorrhages were caused by the victim laying for several hours in a face-down position.  Dr. Van Meter thought they were indicative of strangulation, and that they could have been caused by repeated gripping of the victim's neck.

The experts did not dispute the absence of the classic signs of manual strangulation, but disagreed as to its significance.  Dr. Cooper cited the absence of a broken hyoid bone or laryngeal fractures as evidence that the victim did not die from strangulation.  Dr. Van Meter cited the autopsy report findings that the victim's larynx structures were quite pliable. Both agreed that it is possible to have strangulation without the classic signs, and the bruising on the neck is consistent with significant pressure on the neck.

Also undisputed is the fact that the autopsy showed pulmonary edema in the victim.  However, Dr. Cooper testified that the victim's lungs showed a "very substantial example" of pulmonary edema, which he said was "not something generally associated with strangulation or other types of traumatic death."  RT Vol. I, 38.  Both Dr. Masters and Dr. Van

Meter contradicted this testimony, stating that pulmonary edema is common in many kinds of death, whatever the reason.  They also indicated that the amount of edema was average.

The experts also disagreed about finding inflammation in the victim's lungs.  Dr. Cooper found "acute inflammatory cells" in examining slides of the victim's lungs.  He opined that these were caused by the lungs reacting to irritative stomach acids the victim had inhaled. On the contrary, Dr. Van Meter found no inflammatory response, and further explained that if a person aspirates foreign material into the lungs, the body mounts an inflammatory response, but it takes several hours, or even days, for signs of the response to appear.  Therefore, if something occurred shortly before death to cause such a reaction, no inflammatory response would be visible.

Furthermore, the experts disagreed about the significance of the fluid found in the victim's lungs.  Dr. Cooper noted the presence of squamous epithelial cells in the lungs, which he stated come from the mouth, back of the throat and esophagus, but not the airways.  In his opinion, this indicated that Cox had aspirated.  By contrast, Dr. Van Meter testified that frequently along the upper airways, epithelial cells "go a little sideways" and get characteristics of both squamous and columnar cells as a result of smoking or breathing in other pollutants.  She attributed the fluid in the victim's lungs to the sloughing off of these cells and the edema.

Most significantly, the experts did agree that it is not uncommon for a person to experience agonal aspiration of stomach contents while in the process of dying, which does not actually cause death.  Even Dr. Cooper agreed that because of this phenomenon, pathologists are cautioned not to conclude aspiration is the cause of death.  Dr. Van Meter also explained that people aspirate all the time, but that it is not fatal.  Furthermore, she testified that when someone dies of aspiration, she expects to see a "massive" amount of fluid in the lungs, usually accompanied by food particles that can cause asphyxia.  Both experts agreed that no such food particles appeared in Cox's lungs, since it appears she had not eaten for several hours.

\\\\\

1    As to the presence of the brownish mucoid material around the victim's mouth

2  and nose in pictures from the crime scene and autopsy, the undersigned concludes that this

3  evidence is indeterminative as to the cause of death.  The photographs from the crime scene show

4  a small stream of fluid running from the victim's mouth after she had been turned face up, as

5  well as some wetness in her nose.  See Exhibit A-3, A-5.  In the photographs, the liquid appears

6  clear rather than brown and mucus-like.  The photographs show no fluid or stains near the

7  victim's head in any substantial amount.  See Exhibit A-6.  The photographs at the medical

8  examiner's shows much more fluid, which appears to contain blood, although the coloring of the

9  photograph is off.  Exhibit A-2; RT Vol. I, 55 (respondent noting that the exhibit is a color xerox

10  copy).  Dr. Cooper counted the presence of this fluid as further proof that the victim died from

11  aspiration.  Specifically, he noted Kenn Owen's trial testimony concerning the fluid[11] and

12  discussed the photographs from the medical examiner's, which show more fluid from the

13  victim's nose and mouth.  Dr. Cooper explained that when a dead body is moved, turned or

14  transported, stomach contents can come out the mouth because the esophageal sphincter that

15  keeps things in the stomach is no longer functional.  RT Vol. I, 57.

16    The undersigned notes this testimony with particular interest, as it is now clear

17  that the petitioner was the first person to move the victim's dead body, which he pulled on in an

18  attempt to roll her over.  He also testified that his attempt failed, and she rolled back onto the

19  pillows.  This jostling may have been the cause of the mucus like material that appeared to come

20  from the victim's mouth and nose when Sergeant Kenn Owens encountered it.

21  \\\\\

22

---

23    [11]  It is unclear from Owen's trial testimony whether the fluid coming from the victim's
   mouth was visible when he first encountered the body.  He testified that he pulled a pillow off the
24  side of victim's face, and that the nose and mouth area had saliva and a brownish, mucus-like
   substance running out of her nose and mouth.  RT (state) 49- 50.  He also testified that when they
25  turned the body over, the mouth bubbled and fluid ran down the side of her cheek.  RT (state) 51.
   However, when asked if there was fluid present on her face prior to turning her over, Owens
26  replied, "no. . .I couldn't see her face."  RT (state) 52.

1    All of the evidence presented to date does not militate in favor of finding that the

2    victim died from aspirating her stomach contents.  One cannot overlook the evidence of deep

3    bruising and petechiae around Cox's neck.  Nor can one overlook the petitioner's credibility

4    problems, which existed at the time of his trial and still exist today.  These factors are unaffected

5    by Wilson's error in failing to timely obtain expert testimony about possible aspiration.  Finally,

6    the evidence offered by Dr. Cooper is not enough, in light of all the other evidence, to establish a

7    reasonable probability that the outcome of the trial would have been different.  At best, one can

8    argue that the outcome might *possibly* have been different.  However, possible is not probable,

9    and undermining one's confidence is the standard.  The burden was on petitioner to affirmatively

10   show prejudice by demonstrating a reasonable probability that but for counsel's unprofessional

11   errors, the result of the proceeding would have been different.  That is, he had to affirmatively

12   demonstrate a probability sufficient to undermine confidence in the outcome.  Petitioner has

13   failed to show such reasonable probability, with respect to the "aspiration" evidence.

14   *Conclusion*

15   The undersigned therefore finds that although Wilson's actions were unreasonable

16   in failing to timely investigate the pathology evidence, the petitioner has failed to affirmatively

17   prove prejudice.

18   Nonetheless, the undersigned once again notes his displeasure with the overall

19   process that led to petitioner's conviction for first degree murder.  As petitioner's present counsel

20   correctly observes, petitioner was represented by a lawyer with little experience in a case of this

21   magnitude, and that lack of experience showed.  During trial, seemingly, counsel was more

22   concerned in not angering an impatient judge than he was in vigorously defending his client.

23   Moreover, from a sufficiency of the evidence context, there is precious little *evidence* that any

24   murder of the victim was premeditated, or as a result of some other felony.  While the

25   prosecution must have relied heavily on a years before, drunken, stupid boast by petitioner that

26   he wanted to rape and/or kill a woman, none of the circumstances of record of the victim's tragic

evening indicated that petitioner was looking to make good on that statement.  The best that can be said from the prosecution's standpoint is that petitioner's prevarications, not unusual in a case involving a very young person in deep trouble, came back to haunt him in a large way.  Most of all, the time limits placed on the counsel and the jury in this case were unwarranted for any case involving probable incarceration of a person for the rest of his life.  The real *possibility* remains that petitioner was innocent of the magnitude of the crime – this is a possibility that the jury should have been permitted to consider at greater length.

The above having been said, under our federal law, petitioner's conviction cannot be overturned by a federal court given the limitations of years-after-the-fact federal review.  However, the state still has the ability to recognize unfairness, and still has the power to rectify or mitigate it.  While the victim cannot be brought back, and she should not be forgotten, that tragedy should not be increased by the shoddiness of overall due process in this case.

Accordingly, IT IS RECOMMENDED that petitioner's petition be DENIED.

DATED: 9/6/05

/s/ Gregory G. Hollows

_____
GREGORY G. HOLLOWS
UNITED STATES MAGISTRATE JUDGE

GGH:mb
Faith0493.pho